IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM VIRAMONTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 13 C 6251 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Viramontes sued Chicago Police Officers Jessica Brady and Marc Lapadula and the City of Chicago, alleging excessive force and malicious prosecution stemming from an incident between the parties at a Puerto Rican street festival in Chicago, Illinois on September 4, 2011. (Dkt. No. 15.) The crux of Viramontes's allegations was that the Defendants threw him to the ground and struck him in an effort to take his cellular phone, which he had been using to record what he deemed unlawful police activity. After a three-day jury trial in August 2014, the jury returned a verdict in favor of the Defendants on both of Viramontes's claims. (Dkt. No. 90.) The Court entered judgment on both claims on August 21, 2014.

Viramontes now moves the court for a new trial pursuant to Federal Rule of Civil Procedure 59, arguing that (1) improper argument by defense counsel and (2) various procedural and evidentiary errors by the Court, cumulatively, deprived him of his right to a fair trial. *See Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013). Because any improper conduct by defense counsel was harmless and the Court did not err, and for the following reasons, the Court denies Viramontes's motion for a new trial (Dkt. No. 92.)

<u>**BACKGROUND**</u>[1]

This trial presented a case of dueling testimonies and was, ultimately, a credibility dispute between Viramontes and the Defendants. Viramontes attended a Puerto Rican street festival in Chicago, Illinois on September 4, 2011. The Chicago Police Department ("CPD") assigned Brady and Lapadula to patrol the festival that day. The Court treats the testimony of Viramontes, Lapadula, and Brady, along with the video of the incident, as the primary evidence presented at trial.[2] The Court accordingly summarizes the testimony of the pertinent witnesses below. *See Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013) (courts "routinely set out the conflicting evidence" when considering motions challenging a verdict).

**A.    Viramontes's Testimony**

Viramontes attended a Puerto Rican street festival on September 4, 2011 in Chicago with his girlfriend and aunt. (Trial Tr. 44.) He did not recall what time he went, but he stayed throughout the day and drank two beers. (Trial Tr. 45.) Around 8:30 that evening, Viramontes was looking for his girlfriend after they had been separated at the festival. (*Id.*) He was not intoxicated. (*Id.*) Viramontes testified that as he approached his girlfriend, he witnessed significant commotion and yelling between festival-goers and police officers. (Trial Tr. 46.) After he saw an officer throw someone against a wall, Viramontes took out his phone and began recording the activity. (*Id.*) Viramontes told the jury that Lapadula then approached and told him to put his cell phone away. (*Id.*) Viramontes did not say anything back to Lapadula. (Trial Tr. 79-80.) As Viramontes attempted to put his phone away, Lapadula pulled his arm. (Trial Tr. 47.) Thinking Lapadula was going for his phone, Viramontes pulled his arm back. (*Id.*) Lapadula proceeded to twist Viramontes's arm and forcibly brought him to the ground and handcuffed

---

[1] The Court cites to the trial transcript ordered by the parties as "Trial Tr. ___."
[2] The Court also briefly summarizes Officer Laura Bragiel's testimony. Bragiel was assigned to patrol the same area as Brady and Lapadula on September 4, 2011.

him. (*Id.*) Viramontes stated that while at the festival, he never beat on his chest, pushed anyone, or threw a punch at anyone. (Trial Tr. 61; 103.) He said that he was innocent of any conduct the police officers accused him of. (Trial Tr. 120.)

Viramontes testified that after he was on the ground, he heard Lapadula ask another officer: "Should I hit him, should I hit him?" (Trial Tr. 48.) Lapadula then struck Viramontes twice, even though Viramontes was face down on the ground and in hand cuffs. (*Id.*) Viramontes testified that Lapadula then struck him in the face. (Trial Tr. 102.) Viramontes thought he was hit by a baton in his lower back while Lapadula's knee was near his neck. (Trial Tr. 48.) A group of officers then picked Viramontes up and dragged him to the police wagon. (Trial Tr. 49-50.) Viramontes testified that he did not recall seeing Brady at the incident, never saw her hit him, and never saw her use force on him. (Trial Tr. 118-19.) He said he levied the lawsuit against her because she was Lapadula's partner and assumed she was there. (Trial Tr. 119.) Once in the wagon, Viramontes took a number of pictures of his face with his cell phone, which he still possessed, to document his injuries. (Trial Tr. 50-54.) The officers on scene did not take Viramontes's phone from him, although Viramontes testified that his recording of police activity prompted the confrontation. (Trial Tr. 112.) The pictures showed cuts on Viramontes's lip, nose, and cheeks. (Trial Tr. 55.) The officers took Viramontes to the police station and held him for three hours. (Trial Tr. 57.) He went to the emergency room the next day because he was experiencing severe pain. (Trial Tr. 60-61.) In total, Viramontes incurred $1,324.50 in medical bills stemming from the incident. (Trial Tr. 72.)

B.    **Lapadula's Testimony**

At the time of his testimony, Lapadula had been with the CPD for seven years. (Trial Tr. 143.) He was assigned to the narcotics division where he worked in enforcement and

3

undercover, often working in plain clothes. (Trial Tr. 144.) The CPD assigned Lapadula and his partner, Brady, to the Puerto Rican festival on September 4, 2011. (*Id.*) Both Defendants were wearing their uniforms. (*Id.*) Lapadula testified that he did not carry a baton that day, but that he did not recall if Brady had. (Trial Tr. 146; 182.) While at the festival, Lapadula's duties included intervening if fights broke out and keeping the peace. (Trial Tr. 149.) In the early evening, the festival became violent: multiple altercations and fights took place. (Trial Tr. 150-51.) This behavior was consistent with festivals in the past. (Trial Tr. 181.) Lapadula intervened in a fight that did not include Viramontes and took one individual involved into custody. (Trial Tr. 151.)

Lapadula first noticed Viramontes approximately thirty feet from where he was walking after the scene at the festival became chaotic. (Trial Tr. 153-54.) Viramontes attracted Lapadula's attention because he was "beating his chest like a Roman gladiator." (Trial Tr. 154.) Viramontes was fighting and punching in a group of five to six people, yelling obscenities, and generally acting aggressively. (Trial Tr. 154-55; 185-86.) Lapadula was unable to describe the other individuals involved in the fight. (Trial Tr. 157.) Lapadula did not arrest anyone from the altercation aside from Viramontes, nor did he talk to the other individuals or attempt to help any of them because they left the scene. (Trial Tr. 160-62; 171.) Lapadula said he did not approach or arrest Viramontes because Viramontes was recording police conduct on his cell phone; instead, Lapadula testified that Viramontes was the aggressor in a fight and that is why he arrested him. (Trial Tr. 163; 171.) Lapadula did not recall ever seeing Viramontes with his cell phone in person, but after viewing the video of the incident, he realized that Viramontes did have his phone out. (*Id.*) Lapadula never told Viramontes to stop recording on his cell phone. (Trial Tr. 188.) Upon approaching Viramontes, Lapadula believed Viramontes was intoxicated because his eyes were bloodshot. (Trial Tr. 214.) Lapadula said that Viramontes balled up his left fist and

swung at him with his right. (Trial Tr. 164; 171; 188.) Lapadula then grabbed Viramontes's left forearm with his right hand and issued three open-handed direct mechanical strikes to Viramontes's face. (*Id.*) Lapadula said that he never sought the permission of his fellow officers to strike Viramontes because there is no need for him to seek guidance before applying force. (Trial Tr. 177.) Viramontes continued to resist, so Lapadula administered an emergency take down maneuver to get Viramontes to the ground. (Trial Tr. 171-72.) Lapadula did not punch, kick, or baton Viramontes once Viramontes was on the ground. (Trial Tr. 177.) Lapadula's use of force, including the open-handed strikes and takedown maneuver, was consistent with his training. (Trial Tr. 178-79.) He acknowledged that emergency takedowns can injure the recipient of the maneuver. (Trial Tr. 194.)

After Lapadula gained control of Viramontes, he and his team placed him in a police wagon. (Trial Tr. 173.) Viramontes was visibly injured in the form of a bloody nose but he refused medical care. (*Id*; Trial Tr. 198.) Viramontes continued to be combative with the police officers throughout the interaction between the parties, even after arriving at the police precinct. (Trial Tr. 173) Lapadula failed to document Viramontes's behavior at the precinct in any report or writeup, but Viramontes was placed in the precinct's lock-up instead of being processed due to his conduct. (Trial Tr. 174; 218.) Lapadula similarly never called for either an evidence technician or other member of the police to document Viramontes's injuries, but he did offer Viramontes an ambulance on scene. (Trial Tr. 174-75; 198.)

Lapadula completed an arrest report for Viramontes after the incident. Viramontes told Lapadula that he had been involved in a fight the day before where he suffered injuries to his face. (Trial Tr. 165.) Lapadula failed to document that precise statement in his arrest report, but he noted a laceration to Viramontes's face of unknown origin in the report. (*Id.*; Trial Tr. 167.)

Lapadula wrote that Viramontes pounded on his chest, screamed obscenities, and bumped his chest into other people, but he was unable to give physical descriptions of those people. (Trial Tr. 168-69.)

### C. Brady's Testimony

Brady joined the CPD in October 2005 after completing the police academy. (Trial Tr. 250.) After working as a patrolman in Rogers Park for eight years, she transferred to the tactical team as a plainclothes officer. (*Id.*) On September 4, 2011, Brady was assigned to patrol the Puerto Rican festival and was partnered with Lapadula. (Trial Tr. 251.) Like Lapadula, Brady testified that the festival tended to break into fights as night fell in years past. (Trial Tr. 252.) Before encountering Viramontes, Brady recalled at least one other arrest being made at the festival. (Trial Tr. 254.) She also noticed increased radio traffic and requests for officer assistance as the night went on (*Id.*)

Her testimony concerning the incident was largely consistent with Lapadula's. Brady arrested Viramontes with Lapadula at the festival. (Trial Tr. 231.) Brady similarly noticed Viramontes from twenty to thirty feet away because he was demonstrative, loud, and screaming obscenities. (Trial Tr. 233; 254.) Viramontes was pushing and bumping chests with a group of festival-goers and appeared to be the aggressor in the group. (Trial Tr. 235; 255.) Brady never saw Viramontes holding his phone during either the altercation or the walk to the police wagon, but after viewing the video of the scene, realized that he did have his phone out. (Trial Tr. 236; 261.) In fact, Brady stated that she did not know Viramontes had a cell phone on him because if she had, she would have inventoried it on the scene. (Trial Tr. 262.) Brady was not concerned that he may have been videotaping police officers patrolling the festival because that happens regularly. (Trial Tr. 248.) She said that she expects to be videotaped at every festival she patrols.

(Trial Tr. 262.) Brady testified that she had no reason to believe that police officers at the festival were trying to stop attendees from recording police conduct. (Trial Tr. 248-49.) She approached Viramontes because he was in a fight with the other individuals, but Brady was not sure if the other people were mutual combatants or victims. (Trial Tr. 238.)

As she approached, Viramontes was in a "fighting bladed stance" and was pushing and striking other people. (Trial Tr. 255.) Upon seeing this, Brady walked over to Viramontes to arrest him. (*Id.*) As she placed her hands on him, Viramontes turned and swung at Lapadula. (Trial Tr. 256.) Viramontes missed, Brady grabbed his left arm, and Lapadula administered three open-handed strikes to what Brady though was Viramontes's chest.[3] (Trial Tr. 257.) Viramontes continued to resist despite the use of force, so Brady held onto his arm and Lapadula took him to the ground. (*Id.*) Once on the ground, Brady could not recall if she placed her knee on Viramontes's back, but testified that she may have because it is a way to gain leverage when trying to handcuff a resisting subject. (Trial Tr. 259.) Brady did not use her baton that night. (Trial Tr. 260.) Brady never saw Viramontes bleed after the incident despite having walked him to the police wagon once he was handcuffed. (Trial Tr. 240-41.)

Brady authored a case incident report for Viramontes. (Trial Tr. 233.) She did not specifically identify any of Viramontes's obscenities in the report. (Trial Tr. 234.) She also could not identify any of Viramontes's obscenities at his criminal trial. (Trial Tr. 235.) Brady never called for either an evidence technician or other member of the police to document Viramontes's injuries because he did not have a "visible fresh wound." (Trial Tr. 242; 269.) Brady was also responsible for filing the criminal complaint charging Viramontes with mob action. (Trial Tr.

---

[3] At Viramontes's criminal trial, Brady testified that Lapadula struck him three times in the chest, not the face. (Trial Tr. 239-40.)

243.) The criminal court dismissed the mob action charge. (Trial Tr. 248.) Brady did not charge Viramontes with battery because there was no complaining victim at the time. (Trial Tr. 263.)

### D.    Bragiel's Testimony

Bragiel was also patrolling the Puerto Rican festival on September 4, 2011 after receiving a call for assistance. (Trial Tr. 283; 288.) Upon her arrival, the scene at the festival was chaotic. (Trial Tr. 289.) She heard a lot of yelling in Viramontes's vicinity but did not see anyone fighting. (Trial Tr. 284.) She said there may have been some shoving and pushing in the area, but no fist-fighting. (*Id.*) Bragiel did not see Viramontes swing at Lapadula or Lapadula's ensuing use of force on Viramontes. (*Id.*) Bragiel's attention was drawn to Viramontes, however, because he was screaming obscenities and raising his arms in a confrontational manner. (Trial Tr. 289.) Bragiel witnessed Viramontes refuse to comply with verbal commands and struggle when being handcuffed. (Trial Tr. 289-90.)

## LEGAL STANDARD

A court may order a new trial if the jury's "verdict is against the manifest weigh of the evidence, . . . or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citation and quotation marks omitted). Viramontes faces a heavy burden under Rule 59(a) for establishing the need for a new trial. *See Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011) (movants "bear a particularly heavy burden because a court will set aside a verdict as contrary to the manifest weigh of the evidence only if no rational jury could have rendered the verdict") (citation omitted). As with a motion for judgment as a matter of law, courts uphold jury verdicts "as long as a reasonable basis exists in the record to support [the] verdict." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010). District courts have wide discretion in determining

whether to grant a motion for a new trial, *Mejia v. Cook County, Ill.*, 650 F.3d 631, 634 (7th Cir. 2011), and the Court's evidentiary rulings are granted particular deference. *See Jordan v. Binns*. 712 F.3d 1123, 1127 (7th Cir. 2013) (evidentiary rulings reviewed for abuse of discretion). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011).

## DISCUSSION

### A.     Attorney Misconduct

Viramontes argues that the Defendants' (1) improper comments in closing argument and (2) reference to the CPD "use of force model" in closing argument were prejudicial and deprived him of a fair trial because they contained inappropriate references to excluded topics and violated the Court's motion in limine rulings. "To obtain a new trial based on attorney misconduct, [Viramontes] must show both that the misconduct occurred and that it prejudiced [his] case." *Christmas v. City of Chicago*, 682 F.3d 632, 642 (7th Cir. 2012) (citing *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002)). When a motion for a new trial is based on improper remarks or argument by an attorney that were countered by the trial court with a curative instruction, courts presume that the jury followed that curative instruction. *See Pickett*, 610 F.3d at 446. This presumption is rebuttable if there is an "overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating" to the moving party. *United States v. Humphrey*, 34 F.3d 551, 556-57 (7th Cir. 1994) (citations omitted). Determining whether the presumption has been rebutted requires consideration of the "timeliness and effectiveness of the curative instruction as well as the record as a whole to ascertain whether any prejudice was alleviated." *Id.* at 557. Here, neither the

Defendants' comments in closing argument nor brief mention of the CPD use of force model prejudiced Viramontes to the extent necessary to warrant a new trial, particularly when considering the record as a whole.

Viramontes point to three statements in the Defendants' closing argument for the proposition that he deserves a new trial. Specifically, Viramontes contends that the Defendants' closing argument deprived him of a fair trial because the Defendants improperly referred to Lapadula and Brady as "stars" for the CPD, improperly argued that Viramontes's 2012 felony conviction reflected on his "unwillingness to conform his conduct to the law," and improperly implied that Lapadula's and Brady's use of force was constitutional because it complied with their training. (Trial Tr. 347; 350; 370.)

The Court agrees that the Defendants' reference to Lapadula and Brady as "stars" within the CPD and comment that Viramontes's past felony conviction meant he was unwilling to abide by the law were improper and violated the Court's rulings on the motions in limine on the subjects.[4] Despite these transgressions, the Court denies Viramontes's request for a new trial on this basis because any misconduct did not prejudice Viramontes. *See Christmas*, 682 F.3d at 642 (new trial only warranted if misconduct prejudiced movant's case). "[C]omments made by attorneys during closing arguments rarely rise to the level of reversible error." *Pickett*, 610 F.3d at 445; *see also Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013) (the Seventh Circuit "has been loathe to find that improper comments made during closing argument rise to the level of reversible error"); *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). Here, the comments were both extremely brief and promptly corrected by the Court in the form of sustained

---

[4] Before trial, the Court granted Viramontes's motion in limine to prevent improper bolstering of Lapadula's and Brady's characters. (Dkt. No. 68.) Additionally, the Court denied Viramontes's motion in limine to exclude reference to his 2012 felony conviction, but permitted this conviction be introduced pursuant to Fed. R. Evid. 609(a)(1)(A) for the sole purpose of analyzing Viramontes's character for truthfulness. (Dkt. No. 72.)

objections and instructions. *See Smith*, 707 F.3d at 812 (improper closing arguments only result in reversible error if the challenged statement was "plainly unwarranted and clearly injurious.") (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 730 (7th Cir. 1999)). Moreover, any harm that may have occurred because of the comments—suggesting that Lapadula and Brady are superior police officers or that Viramontes's past conviction makes him incapable of following the law— was undone when the Court sustained both of Viramontes's objections to the comments and instructed the jury, both before and after closing arguments, that the lawyers' closing arguments are not evidence.[5] *See Smith*, 707 F.3d at 812 (improper remarks did not substantially prejudice plaintiff's trial where district court immediately sustained plaintiff's objection and issued a curative instruction); *Lincoln Elec.*, 188 F.3d at 732 ("Moreover, any potential prejudice to [plaintiff] by defense counsel's argument . . . was lessened considerably by the fact that the district court instructed the jury that statements and arguments made by counsel were not to be considered evidence and that the jury should base its verdict solely on the evidence admitted in the case. We have repeatedly found that jury instructions of this sort mitigate any prejudicial effect of potentially improper remarks made by counsel . . . ."). The Court even offered a further curative instruction to strike the statement regarding Viramontes's felony conviction that Viramontes declined. (Trial Tr. 406-07.)

The Court presumes that the jury followed the instructions given. *See Soltys*, 520 F.3d at 744; *3M v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001) ("[A]bsent evidence to the contrary, we assume that juries follow a court's instructions."). Viramontes offers no evidence or argument

---

[5] Before the parties began their closing arguments, the Court instructed the jury that "[t]he closing arguments are not evidence. That's what the lawyers are going to argue that you can make these reasonable inferences from the evidence. And so if they say something that's inconsistent with your memory of the evidence, it's your memory that controls." (Trial Tr. 321.) Again, after the parties finished their arguments, the Court instructed the jury that "[t]he evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations . . . the lawyers' opening statements and closing arguments to you are not evidence." (Trial Tr. 385-86.)

that the jury could not or did not follow the Court's instructions. Accordingly, the two improper statements concerning Lapadula's and Brady's character and Viramontes's 2012 felony conviction did not cause such substantial prejudice to Viramontes that a new trial is warranted.

With respect to Viramontes's contention that the Defendants' comment that Lapadula's and Brady's use of force was consistent with their training deprived him of a fair trial because it violated *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006) by equating constitutional reasonableness of force to a CPD use of force model, Viramontes waived this ground for relief by failing to object to the statement during closing argument. *See Soltys*, 520 F.3d at 745 (plaintiffs who fail to object to statements made by a defense attorney during closing argument waive post-trial challenges to those statements). Even had Viramontes tendered an appropriate objection when the statements were made, the challenge would still fail because the statements were not improper. Unlike the Defendants' improper comments referring to Lapadula and Brady as "stars" and implying that Viramontes's prior conviction meant he could not conform his conduct to the law, the statement that Lapadula and Brady "dealt with that situation in a manner that was reasonable and in compliance with their training," (Trial Tr. 374), did not violate any motion in limine ruling nor *Thompson*. *See* 472 F.3d at 455 (violation or compliance with CPD general orders is irrelevant to determination of reasonableness of use of force). The Defendants never argued that their use of force was reasonable *because* it complied with their training. Instead, the argument was simply that the force used was reasonable and it also happened to be consistent with their training. Here, the jury in all probability properly assessed the reasonableness of Lapadula's and Brady's use of force "by considering testimony describing a rapidly evolving scenario in which [Viramontes] attempted to [resist] arrest," and the verdict

was not the product of an improper argument concerning the CPD use of force model. *See id.* The Court therefore denies Viramontes's motion for a new trial on this basis as well.

### B. Procedural and Evidentiary Errors

Viramontes also argues that he was denied a fair trial because the Court erred four times, either procedurally or substantively, by (1) misstating the law in its instruction to the jury defining malice; (2) allowing the Defendants to use a higher-quality version of the video of the incident; (3) barring the testimony of Brenda Rivera, Marilou Viramontes, Guillermo Viramontes, and Veronica Ramos; and (4) using an improperly constructed *Heck* instruction in violation of the Seventh Circuit's direction in *Gilbert v. Cook*, 512 F.3d 899 (7th Cir. 2008). A new trial based on an error in the admission or exclusion of evidence is granted only in "extraordinary situations." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002). Whether there was reversible error "turns on an analysis of the evidentiary ruling in the context of the entire trial record." *Barber*, 725 F.3d at 705. Where, as here, the movant argues that the cumulative effect of a number of errors deprived him of a fair trial, he must demonstrate "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered his trial fundamentally unfair." *Christmas*, 682 F.3d at 643 (quoting *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011)). Viramontes faces a particularly uphill battle here because the outcome of the trial depended upon the resolution of relatively simple issues from highly disputed factual testimony. *See Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012). Because Viramontes's four challenges are meritless and the Court did not err, it denies his motion for a new trial.

### 1.     Malice Instruction

Viramontes first argues that the Court's malice instruction to the jury was confusing and overstated his burden under the law to prove malicious prosecution. "[I]n order to obtain a new trial based on an incorrect jury instruction, [a plaintiff] must establish both that the instructions failed to properly state the law and that he was prejudiced by the error because the jury was likely to be misled or confused." *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013). The Court views "jury instructions in their entirety in order to determine whether as a whole the instructions were sufficient to inform the jury correctly of the applicable law." *See Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007). Courts maintain substantial discretion in the exact wording of jury instructions and need only issue correct legal statements that convey the relevant legal principles in full. *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 705 (7th Cir. 2005) (citations omitted); *see also Davis v. Wessel*, No. 13-3416, 2015 WL 4095358, at *3 (7th Cir. July 7, 2015) (jury instructions reviewed deferentially).

Here, the Court adequately instructed the jury as to the salient legal issues surrounding a finding of malice in a malicious prosecution claim. Viramontes appears to argue that the Court should have utilized a malice instruction along the lines of: "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice," citing *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 451 (N.D. Ill. 2011) in his brief.[6] (Dkt. No. 96 at 5.) Viramontes contends that the Court erred by instructing the jury that "Plaintiff must have shown that the defendants initiated the criminal proceeding for the purpose of injuring him." (*Id.*) First and foremost, this is a misstatement and incomplete portion of the instruction given. The malice instruction the Court actually gave was:

---

[6] Viramontes's cited authority is a Northern District of Illinois case and is not binding on this Court.

> In order to find malice, you must find that the mob action proceedings commenced against Plaintiff Viramontes was commenced or continued by Defendant Lapadula or Defendant Brady for the purpose of injuring Plaintiff Viramontes or for some purpose other than to prove that Plaintiff Viramontes committed a criminal offense.

(Trial Tr. 394-95.) Ironically, although Viramontes argues that this instruction improperly overstated his burden under the law to prove malicious prosecution, it actually did the opposite by providing the jury with two avenues to reach a conclusion of malice: the Defendants acted with malice if they instituted the mob action proceeding against Viramontes either (1) to injure him or (2) for some purpose other than to prove he committed mob action. Interestingly enough, this second clause is fundamentally identical to the instruction that Viramontes now stresses the Court should have given. Additionally, the Court further instructed the jury that "[m]alice may be inferred from the absence of probable cause if the circumstances that surrounded the start of the criminal proceeding are not consistent with good faith and if the absence of probable cause has been clearly proved." (Trial Tr. 395.)

The Court's malice instruction, in its entirety, *see Lasley*, 500 F.3d at 589, adequately informed the jury of the applicable law when determining whether malice existed. *See Williams v. City of Chicago*, 733 F.3d 749, 759-60 (7th Cir. 2013) (malice means the officer who initiated the prosecution had any motive other than that of bringing a guilty party to justice and jury can infer malice from absence of probable cause). Finally, Viramontes's contention that the Court's instruction favored the Defendants by referring to them in their official office is factually incorrect. As shown above, the Court's instruction referred to the parties by their status in the case and last name. The instruction did not favor either party in any way. The Court did not misstate the law when defining malice for the jury, and accordingly, Viramontes cannot justify a new trial on this basis. *See Rapold*, 718 F.3d at 609 (plaintiff must establish that instruction

failed to properly state the law); *see also Lasley*, 500 F.3d at 589 (court need not "issue a perfect set of jury instructions"). Because Viramontes cannot satisfy his burden of showing a misstatement of the law, the Court need not address his "compromise verdict" argument.

### 2. Video of the Incident

Viramontes next contends that a new trial is warranted because the Court erred by allowing the Defendants to use an altered version of the video of the incident that both parties pulled from YouTube. (Dkt. No. 96 at 6.) The Court denies this basis for a new trial summarily because Viramontes was not prejudiced by the Defendants' use of their version of the video.

Viramontes argues that the Defendants sandbagged him by producing a different version of the video of the incident than the version Viramontes had been relying on throughout discovery. On August 19, 2014, before the parties began their opening statements, Viramontes objected to the Defendants' use of their version of the video, which the Defendants acknowledged was slightly brighter than the version utilized by Viramontes. Both parties retrieved the original video from YouTube and the Defendants stated that their technology department made the video as clear as possible, explaining any difference between the versions. The Court immediately looked at both versions of the video and found them to look exactly the same aside from a slightly lighter background in the Defendants' version. The faces and positions of the participants in the incident were exactly the same and it was clear in both versions that the incident occurred at night. Having looked at the videos side-by-side and concluded that they were identical in every meaningful way, the Court ruled that the parties could use whichever version of the video they prefer.

The Court's conclusion has not changed. Viramontes's cries of undue surprise are completely belied by the content and quality of the videos. There was no tangible difference

between the versions of the video and the Defendants' version was accordingly admissible pursuant to Federal Rule of Evidence 1003. *See* Fed. R. Evid. 1003 ("A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."). Here, there were no circumstances that made the Defendants' use of their video unfair. Both parties retrieved the video from the same location, both versions displayed the exact same events and parties, and both versions were suitable for the jury. Viramontes's argument that he was ambushed by the use of the altered version of the video is unpersuasive because the Defendants' version was identical to his version aside from contrast in the background and harmless to his case.[7]

Viramontes also argues that the Court erred when it granted the Defendants' request to exclude the final ten seconds of the video of the incident because the Defendants used this redaction to their unfair advantage. The final ten seconds of the video recorded an unidentified police officer telling an unidentified individual to turn his cell phone off. Neither the police officer in the video nor the person recording the activity was a party to or witness at the trial. The Court therefore correctly excluded this portion of the video because another officer ordering another individual to stop recording police activity was irrelevant to the jury's task to decide whether Lapadula and Brady used unreasonable force or maliciously prosecuted Viramontes. *See* Fed. R. Evid. 401 (evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence); *see also, e.g.*, *Maldonado v. Stinar*, No. 08 C 1954, 2010 WL 3075680, at *4 (N.D. Ill. Aug. 5, 2010) (barring evidence of police conduct unrelated to defendant police officers outside of voir dire context); *Caldwell v. City of Chicago*,

---

[7] Federal Rule of Civil Procedure 37 does not apply in this situation because the Defendants did not fail "to provide information" by offering a slightly lightened version of the video Viramontes had been using throughout discovery. Even if Rule 37 applied, Viramontes' challenge would be fruitless because the use of the Defendants' version at trial was harmless. *See* Fed. R. Civ. P. 37(c)(1).

No. 08 C 3067, 2010 WL 380696, at *3 (N.D. Ill. Jan. 28, 2010) (barring reference to other police misconduct as irrelevant); *Saunders v. City of Chicago*, 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004) (barring evidence of other police conduct as highly inflammatory and prejudicial).

Viramontes takes issue with the way the Defendants used this ruling, arguing that they misinformed the jury in closing argument when they said that: "The video was trying to film a squadrole car – or police car driving down the street. If there was some misconduct that was taking place, everyone's attention would have been focused on that. And that wasn't the case." (Trial Tr. 356.) Factually, Viramontes's argument that the Defendants' statement created the false impression that the video ended there is not supported by the record. Even if it were, Viramontes neglected to object to this statement during the Defendants' argument and therefore waived any post-trial challenge to it. *See Soltys*, 520 F.3d at 745 (plaintiffs who fail to object to statements made by a defense attorney during closing argument waive post-trial challenges to those statements). Even if the statement was improper and Viramontes had objected, any effect would have been cured by the Court's multiple instructions that the parties' closing arguments are not evidence. *See Lincoln Elec.*, 188 F.3d at 732. Viramontes's challenge to the Defendants' version of the video documenting the incident is therefore not a basis for a new trial.

### 3. Barring Brenda Rivera, Marilou Viramontes, Guillermo Viramontes, and Veronica Ramos from Testifying

Viramontes claims that the Court erred when it barred a number of late- and un-disclosed witnesses from testifying at trial. Before the trial began, the Defendants moved to bar Viramontes from calling Brenda Rivera or Marilou Viramontes at trial, arguing that Viramontes failed to disclose either as a witness pursuant to Fed. R. Civ. P. 26(a)(3). (Dkt. No. 51.) At the final pretrial conference, the parties presented dueling Rule 26 disclosures: Viramontes's version listed Rivera and Marilou while the copy in the Defendants' possession did not. Finding neither

party at fault for the oddity, the Court denied the motion to bar Rivera and Marilou and granted

the Defendants leave to depose them before the trial date. (Dkt. No. 73 at 85.) The Defendants

were unable to depose Rivera and Marilou by the trial date. Before trial on the morning of

August 20, the Defendants informed the Court that they were unable to serve deposition

subpoenas on the two witnesses despite sending a server. The Defendants attempted to call

Marilou, but her telephone line was disconnected. At this point, the Court barred Rivera and

Marilou as witnesses in Viramontes's case in chief because they were unable to be located. In an

effort to salvage the opportunity to depose new witnesses for his case, Viramontes proposed the

Defendants depose two previously undisclosed witnesses: Guillermo Viramontes and Veronica

Ramos. *See* Dkt. No. 65. These witnesses were never disclosed on Viramontes's Rule 26

disclosures, during discovery, or at the final pretrial conference. The Court therefore barred them

from testifying in Viramontes's case in chief but stated that Viramontes could raise the issue in

his rebuttal case pursuant to Rule 37 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P.

37(c)(1) ("If a party fails to . . . identify a witness as required . . . the party is not allowed to use

that . . . witness . . . at a trial"). Viramontes contends that the Court's rulings regarding these four

witnesses were made in error.

The Court denies Viramontes's motion for a new trial on this basis. First and foremost,

Viramontes never sought to call Rivera, Marilou, or Ramos as rebuttal witnesses despite the

Court explicitly leaving that avenue open for him.[8] *See* Trial Tr. 126-27 (regarding Marilou, the

Court stated that "at this point she's barred as a witness from the – from your case in chief. And

the only way she would be able to be coming in now would be as a rebuttal witness."). With

respect to these witnesses, Viramontes never renewed his request to call any of them as rebuttal

---

[8] Before trial on August 18, 2014, in regards to Guillermo and Ramos, the Court ruled that they were barred from Viramontes's case in chief but that he could raise the issue of their testimony again during rebuttal.

witnesses, despite being able to ask the Court for permission to do so, thereby effectively abandoning his request for them to testify. The Court therefore finds no error and considers the argument waived. *See Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1006 (7th Cir. 2008) ("Arguments that could have been made earlier but are instead raised for the first time in a Rule 59 motion are waived."). Viramontes never sought to call Rivera, Marilou, or Ramos as rebuttal witnesses and cannot complain now that the Court precluded them from testifying. *See, e.g.*, *Giles v. Ludwig*, No. 12 CV 6746, 2015 WL 3799522, at *2 (N.D. Ill. June 17, 2015) (party abandoned rebuttal witness request where party failed to make that request at trial); *cf. United States v. Mansoori*, 304 F.3d 635, 652 (7th Cir. 2002) (party cannot complain about trial court's omission of instruction where party did not remind the judge to issue it).

Guillermo, on the other hand, was properly excluded as a witness in both Viramontes's case in chief and rebuttal. The Court barred Guillermo from testifying in Viramontes's case in chief pursuant to Fed. R. Civ. P. 37(c)(1), which provides that a party cannot present a witness at trial if that party failed to identify that witness as required by Fed. R. Civ. P. 26(a) unless the failure to disclose is substantially justified or harmless. *See McCarthy v. Option One Mortgage Corp.*, 362 F.3d 1008, 1012 (7th Cir. 2004). Viramontes's failure to disclose here was neither justified nor harmless. Viramontes did not identify Guillermo as a potential witness in his initial disclosures nor did he otherwise disclose him throughout discovery, which closed on June 30, 2014. (Dkt. No. 12.) Viramontes did not identify Guillermo as a potential witness at the final pretrial conference on August 4, 2014. In fact, Viramontes only disclosed Guillermo on August 8, 2014, ten days before the start of trial. Viramontes failed to disclose Guillermo despite the fact that Guillermo is his brother, was at the Puerto Rican festival with him, is displayed prominently in the video of the incident, and actually helped Viramontes locate the video on YouTube in the

first place. (Trial Tr. 64.)[9] Viramontes's counsel contended that he did not consider Guillermo as a potential witness in the case until he contacted Viramontes's family to obtain clothes for Viramontes to wear during trial. This explanation does not justify Viramontes's failure to disclose Guillermo when considering the circumstances above. Nor was the failure to disclose Guillermo harmless. Guillermo was at the Puerto Rican festival with Viramontes, is in the video of the incident, and helped Viramontes locate the video. Viramontes's counsel stated that Guillermo would testify that Viramontes did not bang on his chest or yell obscenities at the festival. (Trial Tr. 306.) His proposed testimony would therefore go to the heart of the case and corroborate Viramontes's version while disputing the Defendants' rendition. Without the opportunity to depose him, the Defendants would have been severely prejudiced had Guillermo been able to present such explosive testimony. The Court properly barred Guillermo from testifying in Viramontes's case in chief because Viramontes's failure to investigate his case did not absolve him of his failure to disclose.

Guillermo was also the only of the four witnesses who Viramontes attempted to call as a rebuttal witness. The Court properly barred him from testifying in rebuttal as well. Guillermo did not qualify as a rebuttal witness for the same reasons outline above: his testimony went to the heart of the case, was germane to the issues presented, corroborated Viramontes's story, and disputed the Defendants' version universally. Guillermo's testimony was accordingly inappropriate for rebuttal. *See Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008) ("Testimony offered only as additional support to an argument made in a case in chief . . . is improper on rebuttal."); *Braun v. Lorillard, Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) ("The plaintiff who knows that the defendant means to contest an issue that is germane to the prima

---

[9] When asked by his counsel how he found the video of the incident, Viramontes responded: "A brother of mine. A brother . . . Guillermo Viramontes." (Trial Tr. 64.)

facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief. Otherwise the plaintiff could reverse the order of proof, in effect requiring the defendants to put in their evidence before the plaintiff put in his.") (internal citations omitted). Because the Court did not err in excluding Guillermo's testimony, the Court denies Viramontes's motion for a new trial on this ground.

### 4. *Gilbert* Instruction

Viramontes lastly contends that the Court erred in composing and issuing its *Gilbert* instruction regarding his criminal convictions stemming from the incident and their effect on his excessive force claim. This issue was heavily litigated before and during trial and Viramontes offers no novel support for his position that the Court has not already ruled on. Again, in order to succeed on his motion requesting a new trial because of an erroneous jury instruction, Viramontes "must establish both that the instruction[] failed to properly state the law and that he was prejudiced by the error because the jury was likely to be misled or confused." *See Rapold*, 718 F.3d at 609. Here, because the Court's instruction properly stated the law, the Court denies this basis for a new trial.

Lapadula and Brady charged Viramontes with aggravated assault, resisting arrest, and mob action as a result of the incident at the Puerto Rican festival. The presiding judge over Viramontes's criminal trial found him guilty of the aggravated assault and resisting arrest charges. (Dkt. 58, Ex. 3.) In the course of her ruling, the judge concluded that Viramones was "guilty of resisting a police officer and aggravated assault in that he took a substantial step and actively swung in the direction of the police officer and missed." (*Id.*) The judge also found that "after [Viramontes] swung, made the attempt . . . he did actively resist . . ." (*Id.*) This Court was therefore faced with a *Heck v. Humphrey* situation, which prohibits plaintiffs from pursuing civil

claims where a judgment in their favor "would necessarily imply the invalidity of [their] conviction[s]." 512 U.S. 477, 485-86 (1994). *Heck* holds that the plaintiff in an action under 42 U.S.C. § 1983 may not pursue a claim for relief that implies the invalidity of a criminal conviction unless the conviction has been set aside by appeal, collateral relief, or pardon. The Court implemented *Heck* by following the Seventh Circuit's guidance in *Gilbert* and composing an instruction to present to the jury. 512 F.3d at 902 (instead of requiring 1983 plaintiff to confess to underlying convictions open court, proper implementation is through instructions to the jury). The Court barred the Defendants from introducing evidence of Viramontes's convictions for aggravated assault and resisting arrest; instead, the Court fashioned the following jury instruction to comply with *Gilbert*:

> I am instructing you that Mr. Viramontes actively swung in the direction of a police officer and missed. After he swung, Mr. Viramontes actively resisted the police officers. Any statements to the contrary by Mr. Viramontes, his lawyers, or a witness must be ignored. What you need to determine is whether the officers used more force than was reasonably necessary under the circumstances and whether the officers maliciously prosecuted Mr. Viramontes for mob action.

(Dkt. No. 87 at 19.) The Court's instruction was tailored to be consistent with the criminal judge's findings and judgment, not the criminal complaint, and therefore proper. *See Gilbert*, 512 F.3d 899 at 900, 902 (where prison disciplinary board found that plaintiff was able to punch a prison guard while guard was removing his cuffs, proper implementation was "to tell the jurors that [the plaintiff] struck the first blow during the fracas at the chuckhole, that any statements to the contrary by [the plaintiff] (as his own lawyer) or a witness must be ignored, and that what the jurors needed to determine was whether the guards used more force than was reasonably necessary to protect themselves from an unruly prisoner."). Viramontes's argument that the Court should have taken language from the criminal complaint levied against him instead is not

based in law. "Like the law of issue and claim preclusion, *Heck* prevents a litigant from contradicting a valid judgment," not a criminal charge or complaint. *See id.* at 901. The Court's echoing of the criminal judge's judgment was therefore the appropriate way to inform the jury on the underlying facts of the incident without forcing Viramontes to confess to his convictions in open court. His motion for a new trial on this basis is therefore denied.

Viramontes's remaining arguments concerning the Court's *Gilbert* instruction do not warrant lengthy discussion. His contention that the Court issued the instruction prematurely by instructing the jury before Viramontes testified is belied by Viramontes's own citation in his brief. (Dkt. No. 96 at 12.) Courts should issue their *Heck* instructions "to the jury at the start of trial, as necessary during the evidence, and at the close of evidence." *Gilbert*, 512 F.3d at 902. Directing courts to implement *Heck* "at the start of trial" makes it impossible to issue an instruction prematurely. Moreover, Viramontes's persistent contention that the Court's instruction was improper by curtailing his ability to testify because *Heck* bars claims, not testimony, is still incorrect.[10] *See Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014) ("we must consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [the plaintiff's] conviction. To the extent that factual allegations do not do so, [the plaintiff] may proceed under § 1983."). Because the Court did not err in either crafting or issuing its instruction, Viramontes's motion for a new trial is denied.

---

[10] The Court notes that Viramontes was unable to remain agnostic regarding his convictions on the stand. During cross examination, Viramontes professed his innocence. (Trial Tr. 120.)

## CONCLUSION

For the reasons stated herein, the Court denies [92] Viramontes's motion for a new trial.


_____

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  8/4/2015